1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    TANISHIA SAVANNAH WILLIAMS,          Case No.  2:20-cv-1519-TLN-JDP (P)

12              Petitioner,

13        v.                              FINDINGS AND RECOMMENDATIONS

14    MICHAEL PALLARES,

15              Respondent.

16

17

18        Petitioner Tanishia Williams, a state prisoner proceeding with counsel, seeks a writ of

19   habeas corpus under 28 U.S.C. § 2254, contending that her Fourteenth Amendment right to due

20   process was violated because (1) her conviction for human trafficking of a minor it is supported

21   by insufficient evidence; (2) California Penal Code § 236.1 is unconstitutionally vague; and

22   (3) she received multiple punishments for a single offense.  ECF No. 66.  Respondents have filed

23   an answer, ECF No. 78, and petitioner has filed a traverse, ECF No. 80.  After reviewing the

24   pleadings and state court records, I recommend that the petition be denied.[1]

25

26

27

28

---

[1] Petitioner also requests oral argument.  ECF No. 80.  Because I recommend that her petition be denied, I also recommend that this request be denied as unnecessary.

1

1

**Background**

2

I have reviewed the background summary drafted by the state appellate court on

3

petitioner's joint direct appeal.  It is correct, and I reproduce it here:

4

> In this sex trafficking case involving seven named victims,
> defendants Melvin Derell Baldwin-Green and Tanishia Savannah
> Williams were convicted by jury of four counts of human
> trafficking of a minor (Counts 1, 23, 31, and 35)[2], one count of
> abduction of a minor for purposes of prostitution (Count 4), three
> counts of pimping a minor (Counts 5, 24, and 37), two counts of
> pandering a minor (Counts 25 and 36), one count of child abuse
> (Count 7), one count of human trafficking of an adult (Count 13),
> two counts of pimping (Counts 21 and 34), three counts of
> pandering (Counts 15, 22, and 33), one count of kidnapping (Count
> 14), one count of aggravated kidnapping (Count 38), and one count
> of false imprisonment by violence or menace (Count 18).  Baldwin-
> Green was further convicted of additional counts of false
> imprisonment by violence or menace (Counts 9 and 30), human
> trafficking of an adult (Count 26), pimping (Counts 11 and 27), and
> pandering (Counts 12 and 28), as well as one count each of forcible
> rape (Count 29), statutory rape (Count 10), attempted statutory rape
> (Count 19), robbery (Count 20), posing a minor for commercial sex
> acts (Count 8), and making a criminal threat (Count 16).[3]

> The trial court sentenced Baldwin-Green to serve an aggregate
> determinate term of 55 years in state prison consecutive to an
> aggregate indeterminate term of 37 years to life.  Williams was
> sentenced to serve an aggregate determinate term of 30 years 8
> months in state prison consecutive to an indeterminate term of 15
> years to life.

> . . .

> FACTS

> As previously mentioned, this sex trafficking case involves seven
> named victims.  However, because defendants' challenges to the
> sufficiency of the evidence are limited to counts involving four of
> them (C., G., S., and T.), we provide a detailed description of the
> crimes committed against these victims.  While the remaining
> victims (Ad., Az., and K.) are no less important, we dispense with a

---

2 [FN from opinion] With respect to Baldwin-Green, the jury found two of the counts
were committed by use of force, fear, deceit, coercion, violence, duress, menace, or threat of
unlawful injury to another (Counts 1 and 31).  With respect to Williams, the jury found one of the
counts was committed by use of such means (Count 31).  We refer to these crimes as aggravated
human trafficking of a minor.

3 [FN from opinion] The jury acquitted both defendants of one count of kidnapping
(Count 3) and could not reach a verdict with respect to one count of pandering a minor (Count 6).
With respect to Count 9, Williams was convicted of the lesser included offense of false
imprisonment.

2

detailed description of the crimes committed against them and provide a more condensed summary.

***Crimes Committed Against C.***

In November 2012, C. worked as a prostitute in Sacramento.  She was 18 years old.  Her pimp at the time, Kevin, had her walking a stretch of road in North Highlands referred to as "the blade."  She would walk down Watt Avenue from one gas station to a different gas station a short distance away, turn down a side street, and then return to the first gas station via a back street running parallel to Watt Avenue, "catch[ing] more tricks" on the back street.  Kevin rented a room at a nearby Motel 6 while C. worked.

In the middle of the month, Kevin introduced C. to Baldwin-Green, who went by the nickname, "Scooby."  Baldwin-Green picked both up at the Motel 6 in his white Lexus sedan and brought them to his apartment off of Edison Avenue in the Arden- Arcade area. Williams was also at the apartment.  While Baldwin-Green and Kevin talked in the living room, Williams and C. got to know each other in the bedroom.  Williams told C. she was dating Baldwin-Green.  At some point during the visit, Kevin and C. went outside together and Kevin became verbally and physically abusive.  C. was crying when she returned to Williams in the bedroom. Williams held her, saying, "everything is going to be okay" and "you shouldn't be with somebody like that."  C. also met another girl at the apartment, Ad., who was working as a prostitute for Baldwin- Green.  C. asked Williams whether she could also work for him.  Williams said she would talk it over with Baldwin-Green. About two days later, C. ran away from Kevin and started working for Baldwin-Green.

Defendants posted an online advertisement for C.'s services using photographs of her wearing lingerie supplied by Baldwin-Green. Williams took the photographs.  Calls for C.'s services came to Baldwin-Green's cell phone.  He often took these calls, changing "his voice to a girl's voice" while speaking to the potential clients. After a "date" was arranged, either Williams or Baldwin-Green would tell C. what services to provide and how much to charge. Williams would then do C.'s hair and makeup and lay out an outfit. Sometimes the date would involve just her providing the services. Other times, she and Ad. would provide them together.  Either way, C. was required to collect the money up front and hand it over to Williams or Baldwin-Green at the end of the date.  Baldwin-Green would stay in the apartment during the dates, hiding in a closet or behind the couch, in order to protect the girls "if anything bad happens."

In addition to these "in-calls," defendants would also arrange "out-calls" for C., in which they would drive her to the client's location and wait for her in the car.  During one of these out-calls, C. did not collect the money up front and the client refused to pay afterwards, saying: "You know I'm a pimp, right?"  When C. returned to the car without the money, Baldwin-Green drove her back to the apartment and starting yelling about how "stupid" and "dumb" she

3

was.  He then called the "trick-slash-pimp" on the phone, telling him, "if you want her, you can come get her."  After hanging up the phone, he called C. a "stupid bitch."  In response, C. said she was leaving.  Baldwin-Green pulled out a handgun and pointed it at her, saying: "No, you're not going anywhere."  C. was scared and started crying.  This was the first time Baldwin-Green had become violent with her and the first time she had seen him with a gun.

Defendants brought C. up to Redding on three occasions between November 2012 and January 2013.  Each time, they stayed at Baldwin-Green's mother's house for a few days.  During the first trip, C. performed several out-calls.  Williams and her sister, who also joined them for the trip, would get C. ready for the dates and drive her to the client's location.  Sometimes, Baldwin-Green's mother would come along.

After this trip to Redding, back in Sacramento, C. was at a store with defendants when a friend of C.'s cousin started talking to her.  This individual got into an argument with Baldwin-Green.  They eventually took the argument outside to the parking lot, where Baldwin-Green got his gun out of the trunk of his car and threatened to start shooting.  The cousin's friend walked away.  Baldwin-Green then drove Williams and C. back to the apartment and drove off by himself.  Later that night, he called Williams and said C.'s cousin had chased him on the freeway and shot at his car.

Baldwin-Green came back to the apartment the next morning and drove Williams and C. back to his mother's house in Redding.  Apparently during the drive, C.'s cousin called Baldwin-Green.  The conversation became heated.  Baldwin-Green threatened to kill the cousin as well as "his sister, his son and whoever else that was in the way."  C. started crying and asked to be taken home, but Baldwin-Green ignored her while Williams told C. her family did not care about her.  When they got to the house in Redding, C. called her sister on the phone, but Baldwin-Green took her cell phone, saying, "he didn't want nobody to know where [she] was at."  At some point, defendants drove C. back to the apartment in Sacramento.  C. did not attempt to leave when they got back because in the meantime defendants "would say stuff to make [her] not want to go home," specifically, that her family did not want her and that defendants were her family and the only ones who cared about her.

The third trip to Redding occurred in January 2013 and included both C. and Ad.[4]  Both girls performed out-calls during the trip.  When they returned to Sacramento, C. and Ad. decided to leave together.  They waited until Baldwin-Green was not at the apartment and Williams was asleep.  When Williams woke up as they were leaving, she asked where they were going.  Ad. said they were going to her sister's house to babysit.  Williams asked whether

---

[4] [FN from opinion] Ad. was no longer working for defendants during the first two trips to Redding, but returned before the third trip.  As we explain more fully later, Baldwin-Green told her to leave when he found out she was 16 years old, but allowed her to return a short time later.

4

they asked Baldwin-Green. They said no. Williams then blocked their path to the front door and said she was going to call him. C. pushed Williams out of the way and ran out of the apartment. Ad. followed her out the door.

C. continued working as a prostitute in Sacramento after leaving defendants. About a month after leaving, she received a phone call from a man asking for a "car date," meaning she would provide the services in his car. The caller told her to meet him at a nearby gas station. When she arrived, the caller was in a Lexus that looked like Baldwin-Green's car except it had tinted windows and she did not remember his car having tinted windows. So she got inside. When the driver pulled out of the gas station and parked the car behind some nearby houses, Baldwin-Green opened the passenger side door and began hitting C. in the head. C. kicked him and tried to get away, but Baldwin-Green grabbed her by the leg, forced her into the back seat, and got in beside her, continuing to hit her in the head. Williams and another woman also got in the back seat. At Baldwin-Green's direction, Williams held C.'s head down. Baldwin-Green then got in the front passenger seat and the car drove away. A short time later, the car stopped and Baldwin-Green paid the driver, who got out of the car and left.

Williams then took over the driving and Baldwin-Green returned to the back seat. He told C. she owed him $1,300 for damage done to his car when her cousin shot at him on the freeway. He said he was going to take her "to the woods" where he would "cut off all of [her] hair and . . . take all of [her] teeth out." He also threatened to find a cold mountain and "leave [her] there naked . . . to die." Baldwin-Green held C.'s head down and covered her face with a bandana while he threatened her, but she could feel a crescent wrench tightening around her fingers as he threatened to cut them off. C. was "crying and shaking" and told him she wanted to go home. He said she could not leave because she owed him money. C. understood this to mean she would be required to go back to work for him as a prostitute. After a long drive, Williams stopped the car at a motel in Red Bluff and paid for a room. Baldwin-Green escorted C. to that room holding her arm with one hand and a hammer with the other. Inside the room, he asked C. whether she "was going to make his money." C. said no and repeatedly asked to go home. After some yelling and arguing, including Williams telling C. to "just give him his money," Baldwin-Green said he would take her home the following morning.

The next morning, Williams tried to convince C. to pay Baldwin-Green back by working for them as a prostitute. She again refused and asked to go home. Baldwin-Green said he would take her home and they all got back in the car. After some driving around, at Baldwin-Green's direction, Williams stopped the car at a Walgreens and bought scissors. Back on the road, Baldwin-Green called someone on the phone and said he was going to leave C. in the mountains, adding, "why should I care if she dies out there, she didn't care about my safety." They ultimately pulled over in "the woods" north of Red Bluff. Baldwin-Green put on a ski mask and told Williams to use her cell phone to record a video. While she

recorded, Baldwin-Green said, "this is what we do to bitches that . . . didn't care that we was nice." He then cut off C.'s hair, forced her to take off her clothes, and left her on the side of the road naked.

C. walked down the road for awhile and eventually came upon a house that was separated from the main road by a long dirt driveway. Two of the house's occupants, a mother and her daughter, were home at the time. The daughter was the first to notice C. in front of the house, "trying to cover herself" with her arms and hands and looking "nervous and stressed." Alerted to C.'s presence, the mother opened the front door and said: "Oh, my goodness. What is going on? Are you all right?" C. said, "her exboyfriend had cut off all of her hair and that she didn't know where she was." As they spoke, defendant's car drove partway down the driveway and quickly turned around and left again. The mother brought C. inside and called 911 while her daughter gave C. some clothes to wear. A Tehama County Sheriff's deputy arrived a short time later. C. was taken to the hospital.

Later the same day, the mother called 911 again, this time to report a different white car was driving around the neighborhood. The same deputy returned and detained three people in a white Chevy Impala, i.e., Williams, and Baldwin-Green's mother and sister. Baldwin-Green apparently drove his white Lexus to a gas station outside Redding and left it there. The car was found by Shasta County Sheriff's deputies later that night and impounded. The ski mask, crescent wrench, and hammer described by C. were found in the vehicle. The car also had what appeared to be a bullet hole in the radiator.

Based on the foregoing events, defendants were convicted of one count of human trafficking (Count 13), one count of kidnapping (Count 14), two counts of pandering (Counts 15 and 22), one count of pimping (Count 21), one count of false imprisonment by violence or menace (Count 18), one count of second degree robbery (Count 20), and one count of aggravated kidnapping (Count 38). Baldwin-Green was also convicted of one count of making a criminal threat (Count 16).

***Crimes Committed Against G.***

G. met Baldwin-Green in June 2013. By this point, Baldwin-Green was living at an apartment on Cottage Way across from Howe Community Park in the Arden-Arcade area. G. was 17 years old and also lived in the area. She would periodically walk past Baldwin-Green on her way home from school. Baldwin-Green would be standing next to his car parked on the street and would flirt with G. as she walked past. After a number of these encounters, Baldwin-Green gave G. a business card that simply read, "Scooby" and had a phone number. During a subsequent encounter, he asked whether she had a job or was looking for one. G. said she was looking. Baldwin-Green "kind of shrugged" in response. During another encounter, he showed her "a big wad of cash" that he had in his pocket and told her he had a business that

"makes a lot of money."  He also pointed out which apartment he lived in and told her she could come over if she ever wanted to "just hang out or talk."

G. thought Baldwin-Green was probably a drug dealer, but also that he was "pretty nice, like friendly," and they could be friends.  At some point, G. took him up on his invitation to come over.  When she knocked on his door, another girl looked out the window but did not open the door.  G. left.  On a different day, she ran into Baldwin-Green again and he invited her inside.  G. had gotten into a fight with her mother and did not want to return home, so she followed him into his apartment.  Inside the apartment, G. met the girl who had previously looked out the window when she first knocked on Baldwin-Green's door.  This girl, K., offered G. some marijuana.  The two smoked together and became friends.  G. also met Williams, whom Baldwin-Green introduced as his cousin.

G. stayed at the apartment for about a week and a half.  About two days after she arrived, Baldwin-Green told G. she should think about working as a prostitute if she wanted to make money.  G. was "shocked," but the way Baldwin-Green broached the subject indicated "it was no big deal."  She said nothing in response.  Later, K. brought up the subject of prostitution in the apartment complex's pool.  G. did not agree to become a prostitute during this conversation either.  After the conversation, she and K. went back into the apartment and smoked marijuana.  Despite the lack of agreement on G.'s part, Williams later told her "a guy was going to come" to the apartment and she "had to stay" while everyone else left.  G. understood this to mean the man was coming there to have sex with her.  Williams confirmed this when she said the man "knew the price" and told G. to collect the money first.  Rather than protest, G. decided to try to leave after defendants left and before the client showed up.

The client arrived before G. could leave the apartment.  K., who was also still in the apartment when he got there, told him to come in and then left as the man handed G. the money.  G. offered to return the money rather than have sex with him, but he said he did not want his money back and she "had to give him what he paid for."  The man then forced G. to have sex with him on the floor.  Defendants and K. returned shortly after the man left.  Baldwin-Green demanded the money G. was paid.  G. initially looked at K., who told her to "give it to him."  G. complied and handed over the money.

Williams scheduled one more in-call for G. at the apartment, but she refused to have sex with the client and did not receive any money.  An out-call was also scheduled. Baldwin-Green drove her to the client's house and dropped her off, but G. refused to go through a gate leading to the house by herself and returned to the car saying, "it looked sketchy."  Baldwin-Green said, "whatever" and drove her back to the apartment.

Defendants then decided to have G. and K. walk Watt Avenue together and perform car dates.  Baldwin-Green warned G. to avoid

"flashy" cars because other pimps would be out there.  As G. explained his warning, "if a pimp saw me, then he would take me and abuse me and take everything that I have and practically leave me out for dead."  Baldwin-Green also told G. that he would be watching her in case "a pimp tried to get [her] or something goes wrong."  G. was too scared to try to run away.  Over the span of a few days, G. performed several car dates and gave the money she made to Baldwin-Green, who was parked at a nearby Kentucky Fried Chicken.  After one of the car dates, G. tried to keep some of the money for herself.  Williams caught her with the money in her bra and told her to give it to Baldwin-Green "before he finds out."  Her voice was "stern" and "cold" when she issued this directive.  Nevertheless, G. continued to keep some of the money she made, explaining: "I feel like I'm being used, so whatever I'm doing, then I'm going to keep it.  I'm going to keep half regardless, because I was going to leave."

About a week and a half after G. started working for defendants, she and K. decided to leave together, along with another girl who arrived at the apartment a day or two before.  They waited until defendants left the apartment and ran to a nearby Starbucks together.  The other girl, whom everyone called "the Kid," secured a ride to South Sacramento for the three of them.

In the meantime, G.'s mother was trying to find her daughter.  G. had run away before, but always returned in a few days.  Her mother found a phone number for "Scooby" in G.'s backpack and called the number.  A female answered the phone.  After speaking to this female, G.'s mother unsuccessfully searched for her daughter at an apartment complex.  She called the number again and eventually spoke to Baldwin-Green, who connected her, by way of a three-way call, to another female who was apparently with G. in South Sacramento.  After several hang ups, this female agreed to drop G. off at a gas station near the Arden Fair Mall.  Baldwin-Green offered to meet G.'s mother at the gas station "to make sure everything [was] fine."  She agreed.  G. was dropped off at the gas station as arranged.  Baldwin-Green also came to the gas station, but stayed in his car.  When G. met her mother at the gas station, she saw Baldwin-Green's car and became agitated.  Police also arrived a short time later and arrested G. on a juvenile warrant.

G. was later interviewed by an investigator.  G. stated during the interview that she told Baldwin-Green she was not going to work as a prostitute, to which he responded, "she did not have a choice" and "told her that he would hurt her mom if she refused."

Based on the foregoing events, defendants were convicted of one count of aggravated human trafficking of a minor (Count 31), one count of pandering a minor (Count 33), and one count of pimping a minor (Count 34).

### Crimes Committed Against S.

S. met Baldwin-Green in December 2013.  She was 18 years old and working as a prostitute in Vacaville.  Baldwin-Green got her

cell phone number from an online advertisement she had put up for herself. He sent her a text message with a picture of "stacks of money" attached. The text message told her she needed to choose a pimp and offered himself as that pimp. S. agreed to meet Baldwin-Green on Watt Avenue. He told her he would be arriving in a white sedan, but pulled up in a dark green car. S. got in the car and agreed to work for him. As she explained: "I had nowhere else to go. At the time, I was going from house to house homeless and [working for Baldwin-Green] was basically stable, safe shelter." Baldwin-Green then picked up Williams and the three drove to a one-bedroom apartment in Redding.

At the apartment, Baldwin-Green took photographs of S. in lingerie he provided, placed an online advertisement for her services, and also booked the dates. As S. described, he "sounded like a girl" when he talked to potential clients on the phone, adding, "he played it off smooth so they were thinking they were really talking to a female." S. performed several in-calls in the living room of the apartment during the month of December. She slept in the bedroom with Baldwin-Green. Williams would periodically stay the night at the apartment and slept on a futon. The second night S. was at the apartment, Baldwin-Green showed her he had a gun and some knives. While S. never attempted to leave the apartment, at least not until she successfully did so on December 31, she testified the doorknob on the bedroom door was "switched inside out" such that Baldwin-Green was able to lock it from the outside. On three or four occasions, he locked her in the bedroom. On two occasions, S. told Baldwin-Green she wanted to go back to Sacramento. He refused and said she "wasn't making enough money." S. had access to a cell phone while she was at the apartment and used it periodically to call her mother, but testified she did not tell her what was going on because she believed her mother would have told her to "find a way home."

Baldwin-Green and S. had sex twice while she was at the apartment. The first night she was at the apartment, Baldwin-Green came into the bedroom and told her she would not be going home unless she had sex with him. S. did not want to do so, but complied without objection because she thought she "had to" in order to "make a little money and leave." They had sex again a couple days later. Baldwin-Green did not say anything beforehand. S. did not want to have sex with him this time either. When asked why she had sex with him again, S. testified: "Just did."

As mentioned, S. left the apartment on December 31. She was in the bathroom talking to her mother on the phone when defendants came in the bathroom and started arguing with her, apparently about the fact she was on the phone. Baldwin-Green took the cell phone and threw it on the floor, breaking it. The argument moved to the living room. Baldwin-Green told Williams to hit S. Instead, Williams grabbed S. and held her "between her arms" while Baldwin-Green called his mother, who showed up a short time later with two other people. When S. demanded to leave, Baldwin-Green's mother told her son: "Let her go." After some discussion

between Baldwin-Green and his mother, someone opened the front door and S. walked out of the apartment.

S. ran across the street to a woman who was in her driveway putting her children in her car to go grocery shopping. S. was "screaming to call 911." The woman described S.'s demeanor as "really upset," adding: "She was crying. Her make-up was all over her face. Her hair was messed up. She was putting—her shoes were under her arm." The woman called 911. During the call, Williams also came across the street and "was trying to convince [S.] that everything was fine and to come back with them." S. responded: "Get the fuck away from me." Williams returned to Baldwin-Green and the others, who were watching from across the street. Everyone got into a Chevy Impala and drove away. After some time waiting for law enforcement officers to arrive, the woman who made the 911 call drove S. to the police station herself.

Based on the foregoing events, Baldwin-Green was convicted of one count of human trafficking (Count 26), one count of pimping (Count 27), one count of pandering (Count 28), one count of forcible rape (Count 29), and one count of false imprisonment by violence or menace (Count 30).

***Crimes Committed Against T.***

T. was 16 years old and living in Sacramento when she met Baldwin-Green. They met through an online dating Website sometime toward the end of 2013. T. told Baldwin-Green her age, either while communicating through the Website or after exchanging phone numbers and communicating through text messages. They met in person two or three weeks later. As T. explained, based on their text message interactions, "he seemed like a really nice person and very peaceful to be around." When they met in person, Baldwin-Green also brought Williams. This first encounter involved sitting in Baldwin-Green's car and "getting to know each other a little better." On another occasion, they arranged to meet at a party. Williams was there as well. The third in-person encounter involved defendants picking T. up at her house and driving her to Redding, to the same apartment S. stayed at, although apparently before S. arrived.[5] T. stayed at the apartment for three days, sleeping in the living room. She kept to herself for the most part because Baldwin-Green's "presence and the way he was talking and moving around a whole lot made [her] feel uneasy." After three days, Baldwin-Green drove T. home.

Back in Sacramento, Baldwin-Green continued communicating with T., mainly through text messaging. T. told him she felt uneasy

---

    5 [FN from opinion] As we explain shortly, it was not until T.'s third trip to Redding that she began engaging in prostitution. As previously mentioned, S. was at the apartment in December 2013. She remembered T. being there and engaging in prostitution, testifying that T. was brought to the apartment by Baldwin-Green sometime after S. got there. From this, we may reasonably conclude S. was there only for T.'s third trip to Redding, which must have happened sometime in December 2013 since that was when S. was staying at the apartment.

about being in Redding with him.  He promised "next time it wouldn't be that way."  T. decided to give him another chance.  At some point, Baldwin-Green and Williams picked her up and drove her back to the same apartment in Redding.  This time, T. stayed for only two days.  When she told Baldwin-Green she wanted to go home, he became "angry and furious" and gave Williams money to buy her a bus ticket back to Sacramento.  When T. got back to Sacramento the second time, she considered deleting Baldwin-Green's number from her phone, but decided to give him a final chance and resumed communication.  After they talked some more, T. felt like she knew him "a little better" and agreed to make a third trip to Redding with him.  Defendants again picked her up and drove her to the same apartment.

Defendants brought up the subject of prostitution after they got to the apartment.  When T. said she was not comfortable doing that, Baldwin-Green "got mad and started cussing."  T. again said she wanted to go home.  Baldwin-Green responded, "[I] don't give a fuck," and told T. she "will be prostituting" and "would be staying out there for as long as he wants."  T. then started "screaming and cussing" and tried to leave the apartment, but Baldwin-Green pulled her back inside and the two yelled at each other in the apartment, "screaming and cussing back and forth."  Baldwin-Green told her, "you can try to leave all you want, but you will not get far out there" and "this is my city."  T. tried to leave again, but he blocked her path to the door.  After that, she "just gave up."  Baldwin-Green brought up prostitution again after they had calmed down.  T. repeated she would not be doing that.  Baldwin-Green responded: "[T]hat is the only way you're going to get back home."  He also showed her a video on his cell phone of "a girl getting beat up by a dude and everybody was just sitting there laughing, like it was all fun and games."  T. recognized Baldwin-Green in the video, and, while she did not say whether he was the one delivering the blows, she understood the video to depict "what he did to girls before" and described it as "very terrifying."  After watching the video, T. "gave in" and "went into prostitution."

Similar to his previous victims, Baldwin-Green took photographs of T. in lingerie, used them to place an online advertisement for her services, and also booked the dates, "disguis[ing] his voice as a girl" while talking to potential clients.  Also like S., T. performed in-calls in the living room of the apartment, collecting the money up front and handing it to Baldwin-Green after the date.  Some of the sex acts were performed with another girl, possibly S.  T. also had sex with Baldwin-Green twice at the apartment.  She was still 16 years old.

According to T., Williams's role was "just helping [Baldwin-Green] out with all he needed," such as buying condoms and lubrication and picking up food.  Williams was "friendly" to T. while she was at the apartment and at some point T. asked Williams to help her leave.  Williams said that was not "in her hands" and it was instead "all up to [Baldwin-Green]."  T. also tried to escape out of the bathroom window, but the window was too small.  She did not try to leave through the front door because, as T. explained,

Baldwin-Green "always had [Williams] there with me to make sure I don't go outside." And while defendants and T. periodically went out in public together, T. did not try to run away or call out for help because she was afraid Baldwin-Green would "do something stupid." When asked what she meant by "something stupid," T. answered: "He'll yell and actually hit me one time when he got mad because I didn't want to do a date." T. further testified Baldwin-Green bragged "that he got guns and that he know how to use them," which "scared the living hell out of [her]."

Defendants moved T. to a different apartment in Redding sometime after S. left. She continued to perform in-calls at this apartment. Baldwin-Green and T. also had sex a third time while staying there. When asked why she did not try to escape from this apartment, T. explained Baldwin-Green "had every door bolted and locked and he flipped the locks" so they could be locked from the outside. The windows also had "little bolts" preventing them from opening. T. saw Baldwin-Green installing these bolt locks. She tried to unscrew them at some point, but they were "too hard to unscrew."

T. escaped from the apartment in April 2014. Baldwin-Green "got mad" about something and "stormed out" of the apartment, forgetting to take her cell phone with him. Apparently, Williams was not at the apartment at this time. T. took this as her opportunity to leave. As she described: "I called my sister and I told her what happened and what he did to me and asked her to call 911. And that's when I called 911 and that's when I got my stuff and went out the house. And she told me go to the nearest neighbor to help you. You know, the next door neighbor, he was deaf so he couldn't help me so I ran to the next person that was able to help." That person was leaving her house to help her niece move into a different house down the street. T. ran up to the woman and asked to hide in her house. The woman described T.'s demeanor as "anxious, upset," with "tears in her eyes." Nevertheless, the woman declined to bring T. inside her house. Instead, she told T. to "go hide somewhere" and she would "get back to [her]" after helping her niece. She then walked to her niece's new house and told her what happened. The niece responded: "Auntie, you cannot leave that girl down there." The woman then went back outside and motioned for T. to come to the niece's house. T. quickly walked over to the house and went inside, where she told the niece what had happened. Officers with the Redding Police Department arrived a short time later.

Based on the foregoing events, defendants were convicted of one count of aggravated human trafficking of a minor (Count 1), one count of abduction of a minor for purposes of prostitution (Count 4), one count of pimping a minor (Count 5), and one count of child abuse (Count 7). Baldwin-Green was additionally convicted of one count of posing or modeling a minor for commercial sex acts (Count 8), one count of false imprisonment by violence or menace (Count 9), one count of statutory rape (Count 10), and one count of attempted statutory rape (Count 19). With respect to Count 9, Williams was convicted of the lesser included offense of false imprisonment.

*The Remaining Victims (Ad., Az., and K.)*

As previously mentioned, Ad. worked as a prostitute for defendants during roughly the same time period as C. She met Baldwin-Green while working a stretch of road known for prostitution in the South Sacramento area, Stockton Boulevard. She was 16 years old when she started working for defendants. At some point they discovered she was a minor and told her she had to leave. A short time later, however, they allowed her to come back to work for them so long as she interacted primarily with Williams and gave her the money she made. Defendants also brought her to Redding with C. on one occasion to perform out-calls while she was still a minor. Based on their conduct involving Ad., defendants were convicted of one count of human trafficking of a minor (Count 23), one count of pimping a minor (Count 24), and one count of pandering a minor (Count 25).

As also mentioned, K. worked as a prostitute for defendants during roughly the same time period as G. She met Baldwin-Green at a gas station on Watt Avenue. She was 16 years old and worked for defendants for two or three months, performing about 15 in-calls a week. During this time period, she also performed one out-call and several car dates. Based on their conduct involving K., defendants were convicted of one count of human trafficking of a minor (Count 35), one count of pandering a minor (Count 36), and one count of pimping a minor (Count 37).

Finally, Az. was working as a prostitute in Sacramento when she met Baldwin-Green in May 2014, after the events involving T. He contacted her through an online advertisement she had put up for herself and told her she could make more money working for him in Redding. Az. agreed and spent about a week at a house in Redding with Baldwin-Green and Williams. Az. performed four or five in-calls and one out-call. A second out-call was scheduled, but the purported client was an officer with the Redding Police Department, who booked the out-call as part of a sting operation conducted following T.'s escape, described above. Based on his conduct involving Az., Baldwin-Green was convicted of one count of pimping (Count 11) and one count of pandering (Count 12).

ECF No. 77-22 at 1-19.

While each of petitioner's convictions were affirmed, petitioner's sentences for Counts 5, 15, 22, 24, 34, and 37 were stayed pursuant to California Penal Code § 654. *Id.* at 66. The court also remanded back to the trial court for the limited purpose of determining whether petitioner had a sufficient opportunity to make a record of information relevant to her eventual youth offender parole hearing. *Id.* at 66-67.

1    Petitioner petitioned the California Supreme Court to review the issues not decided in her

2    favor in her direct appeal.  ECF No. 77-26 at 1-17.  The California Supreme Court denied the

3    petition.  ECF No. 77-27.  Ultimately, petitioner's sentence was updated and set at twenty-four

4    years' imprisonment plus fifteen years to life imprisonment.  ECF No. 77-28 at 10.

**Discussion**

6    **I.    Legal Standards**

7    A federal court may grant habeas relief when a petitioner shows that his custody violates

8    federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

9    (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

10   Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

11   562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

12   last state court to have issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v.*

13   *Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)

14   ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned

15   opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*,

16   621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was

17   last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

18   ("Because the California Supreme Court denied review of Gill's habeas petition without

19   comment, we look through the unexplained California Supreme Court decision to the last

20   reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

21   Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

22   "adjudicated on the merits in state court proceedings" only if the state court's adjudication

23   resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

24   established Federal law, as determined by the Supreme Court of the United States" or (2) "based

25   on an unreasonable determination of the facts in light of the evidence presented in the State court

26   proceeding."  28 U.S.C. § 2254(d).

27

28

14

## II.    Analysis

### A.  Insufficient Evidence on Count 31

Petitioner first argues that her conviction on Count 31—human trafficking of a minor for a sex act—is supported by insufficient evidence, in violation of her Fourteenth Amendment right to due process.  ECF No. 66 at 9.  She contends that the state alleged an enhancement under § 236.1(c)(2), arguing that she allegedly made an implied threat that "something worse" would happen to victim G. based on petitioner's tone of voice during the conversation.  *Id.* at 9-10.  She argues that such evidence was insufficient to demonstrate that she used force, fear, deceit, coercion, or any other threat.  *Id.* at 11-12.  She also argues that the elevated punishment as an aider and abettor was unwarranted because the evidence did not demonstrate that Williams was around when Baldwin-Green forced G. into human trafficking.  *Id.* at 11-12.

Petitioner raised this claim in her direct appeal, which the state court of appeal rejected:

> SUFFICIENCY OF THE EVIDENCE
>
> **II**
>
> ***Aggravated Human Trafficking of a Minor (Count 31)***
>
> Both defendants claim their convictions for aggravated human trafficking of G. must be reversed for lack of sufficient substantial evidence to support the existence of one of the aggravating circumstances set forth in the statute.  They are mistaken.
>
> "'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].)  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]  Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)
>
> As we explained in part I of this opinion, in order to convict defendants of human trafficking of a minor, as alleged in Count 31, the prosecution was required to prove: (1) they caused, induced, or persuaded, or attempted to cause, induce, or persuade G. to engage

15

in a commercial sex act; (2) G. was a minor at the time; and (3) defendants possessed the specific intent to effect or maintain a violation of either section 266h or 266i, i.e., pimping or pandering. (See § 236.1, subd. (c).)  Defendants do not challenge the sufficiency of the evidence to prove these elements.  Rather, they claim the evidence is insufficient to support the existence of one of the aggravating circumstances set forth in subdivision (c)(2), i.e., "force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (§ 236.1, subd. (c)(2).)

G. testified she never agreed to work as a prostitute for defendants, but they scheduled a date for her anyway.  She was informed of this fact when Williams told her a man was coming to the apartment, she "had to stay" there while everyone else left, the man "knew the price," and to collect the money before having sex with him. Rather than protest, G. decided to try to leave after defendants left and before the client showed up, but the client arrived too soon. When she refused to have sex with the man, he raped her on the floor.  G. then refused another in-call and an out-call, resulting in defendants having her perform car dates with K. on Watt Avenue. Baldwin-Green watched them from a nearby parking lot.  While G.'s testimony did not include any threats made by Baldwin-Green, in an interview with an investigator, G. said she told Baldwin-Green she was not going to work as a prostitute, to which he responded, "she did not have a choice" and "told her that he would hurt her mom if she refused."  Because G. claimed during her testimony that she did not remember Baldwin-Green threatening her mother, this prior inconsistent statement to the investigator was admitted for the truth of the matter asserted, i.e., that Baldwin-Green had in fact threatened to harm G.'s mother if she refused to work for him as a prostitute.  (*See* Evid. Code, § 1235;  *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1076 [victim's testimony she did not recall certain acts "was inconsistent 'in effect'" with her earlier statement to a detective].)  From this, the jury could reasonably have concluded Baldwin-Green made a "threat of unlawful injury to . . . another person" in order to induce G. to engage in commercial sex acts within the meaning of section 236.1, subdivision (c)(2).

With respect to Williams, the prosecution specifically relied on her "stern" and "cold" directive to G. to give Baldwin-Green the money she was withholding from him following several car dates.  The prosecutor characterized this as "an implied threat" during closing argument.  Williams argues this conduct does not amount to "menace" as that term has been defined in the case law.  We need not decide the matter, however, because we conclude there is more than enough evidence to support her conviction based on the theory she knowingly and intentionally aided and abetted Baldwin-Green's commission of aggravated human trafficking of a minor.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids,

promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)  The prosecution relied on aiding and abetting principles to support most of the counts charged against Williams.  As the prosecutor stated in closing, "in most instances, [Williams] is aiding and abetting."  The jury was also instructed on these principles.

Based on all the evidence, the jury reasonably could have concluded Williams knew Baldwin-Green intended to persuade G., a minor, to engage in commercial sex acts with the specific intent to pimp or pander her, and intending to facilitate the commission of the crime, she aided Baldwin-Green in doing so.  And even if we were to accept that she did not initially intend for Baldwin-Green to commit the aggravated form of the offense, she continued providing assistance after he threatened to harm G.'s mother.  At that point, Baldwin-Green was committing aggravated human trafficking of a minor and Williams was aiding and abetting its commission.  (See *People v. Cooper*, *supra*, 53 Cal.3d at p. 1164 [aider and abettor may form intent to render aid during the commission of the crime].)

Defendants' convictions in Count 31 for violating section 236.1, subdivision (c)(2), are supported by sufficient substantial evidence of their guilt.

ECF No. 77-22 at 27-30.  Petitioner petitioned the California Supreme Court to review this issue, which it declined to do.  ECF No. 77-27.

Petitioner's claim should be denied.  Under the Fourteenth Amendment's Due Process Clause, no person can suffer a criminal conviction "except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).  A habeas petitioner challenging the sufficiency of evidence under *Jackson* must overcome "two layers of judicial deference." *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  On direct appeal, the state appellate court decides "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  On habeas review, AEDPA's deferential standard applies, and a federal court may "overturn a state court decision rejecting a sufficiency of the evidence challenge . . . only if the state court decision was 'objectively unreasonable'" under AEDPA. *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).  The "only question under *Jackson*" is whether the jury's finding was "so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.  It "is the responsibility of the jury—not the court—to

17

1   decide what conclusions should be drawn from evidence admitted at trial." *Cavazos*, 565 U.S. at

2   4.  Importantly, "a state court's interpretation of state law, including one announced on direct

3   appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v.*

4   *Richey*, 546 U.S. 74, 76 (2005).

5          Here, the state appellate court reasonably determined that sufficient evidence established

6   that petitioner aided and abetted in the human trafficking of a minor.  The state appellate court

7   explained that, regardless of whether petitioner could be deemed as personally having used

8   menace to human traffic a minor, her actions in aiding and abetting Baldwin-Green in doing so

9   sufficiently supported her conviction.  As the state appellate court noted, an individual is liable

10  for aiding and abetting the commission of a crime when that person (1) with knowledge of the

11  unlawful purpose of the perpetrator, (2) and with the intent of committing, facilitating, or

12  encouraging the crime, (3) aids, promotes, encourages, or instigates the commission of the crime

13  through acts or advice.  *People v. Cooper*, 53 Cal.3d 1158, 1164 (1991).  Under California law,

14  an accomplice is guilty of the offense she aided or abetted the perpetrator in completing.  *People*

15  *v. Curiel*, 538 P.3d 993, 1006 (Cal. 2023).

16         Under this law, which I am bound to follow, *see Bradshaw*, 546 U.S. at 76, petitioner's

17  conviction for the human trafficking of a minor, as alleged in Count 31, is supported by sufficient

18  evidence and does not violate due process.  As outlined in the state appellate decision, in viewing

19  the evidence in a light most favorable to the state, the state presented ample evidence of petitioner

20  aiding and abetting Baldwin-Green to commit the underlying offense.  As such, the state appellate

21  court's decision on this issue was not objectively unreasonable, *see Coleman*, 566 U.S. at 651,

22  and petitioner's claim should be denied.

23                    **B.      Unconstitutionally Vague**

24         Petitioner also argues that her Fourteenth Amendment right to due process has been

25  violated because California Penal Code § 236.1(c)(2) is unconstitutionally vague.  ECF No. 66 at

26  13-14.  She contends that § 236.1 fails to define the elements of the offense, relying on *Johnson v.*

27  *United States*, 576 U.S. 591, 597 (2015).  *Id.*  She asserts that the term "involves," as used in the

28  statute, creates an unconstitutionally vague offense.  *Id.*

The state appellate court rejected this argument in petitioner's direct appeal:

## CONSTITUTIONAL CHALLENGE

### I

### *Vagueness and Overbreadth*

Baldwin-Green contends his convictions for aggravated human trafficking of a minor (Counts 1 and 31) must be reversed because section 236.1, subdivision (c)(2), is unconstitutionally vague and overbroad, both on its face and as applied. We disagree.

Section 236.1, subdivision (c), provides: "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking. A violation of this subdivision is punishable by imprisonment in the state prison as follows: [¶] (1) Five, 8, or 12 years and a fine of not more than five hundred thousand dollars ($500,000). [¶] (2) Fifteen years to life and a fine of not more than five hundred thousand dollars ($500,000) *when the offense involves* force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (Italics added.)

Counts 1 and 31, involving T. and G. respectively, charged Baldwin-Green with the aggravated form of this crime. With respect to these counts, the jury was instructed the prosecution was required to prove he caused, induced, or persuaded, or attempted to cause, induce, or persuade these minor victims to engage in a commercial sex act while he possessed the specific intent to commit or maintain a violation of either section 266h (pimping) or section 266i (pandering). The jury was further instructed the prosecution was required to prove "the additional allegation that when the defendant committed those crimes, he/she used force, fear, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the other person or to someone else." The statutory terms, "duress," "menace," and "coercion," were then defined for the jury.

### A.

### *Facial Challenge*

Baldwin-Green argues section 236.1, subdivision (c)(2), is unconstitutionally vague and overbroad on its face because it requires only that the human trafficking offense "involve" one of the aggravating circumstances. He asserts that because such a circumstance "raises the offense level from a determinate term of five, eight, or twelve years to an indeterminate term of fifteen years to life[,] . . . fundamental due process requires that there be a certain test of causality and knowledge and intent which is stated in the statute and communicated to the jury and supported by substantial evidence." In other words, according to Baldwin-Green, in order to

19

satisfy due process, one of the aggravating circumstances must have "caused the human trafficking to occur," and the defendant must have known and intended that to be the case. Clarifying his position in the reply brief, Baldwin-Green argues the statutory term, "involves" is both "too vague to provide guidance for the imposition of criminal penalties" and too broad because it allows "conviction for aggravated human trafficking merely because the offense 'involves' force, duress, etc." without a showing that such an aggravating circumstance "caused the victims to acquiesce in human trafficking."

We begin with the statutory language. Section 236.1, subdivision (c), makes it a crime to cause, induce, or persuade, or attempt to cause, induce or persuade, a minor to engage in a commercial sex act, with the specific intent to effect or maintain a violation of several listed offenses, including pimping and pandering. If "the offense," i.e., the defendant's act of causing, inducing, or persuading, or attempting to cause, induce, or persuade, a minor to engage in a commercial sex act with the requisite specific intent, "involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person," the aggravated form of the crime has been committed and the offense is punishable by a term of 15 years to life in prison. (§ 236.1, subd. (c)(2).) Thus, the statute requires the defendant's commission of the offense to "involve" one of the aggravating circumstances.

The dictionary definition of "involve" includes, "to engage as a participant," "to oblige to take part," "to have within or as a part of itself," and "to require as a necessary accompaniment." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 660, col. 1.) The first two of these definitions deal literally with involving a person or entity in an endeavor, such as workers engaged as participants in the building of a house or Congress obliging the nation to go to war. (*Ibid.*) The second two, however, are apt definitions for our purposes. Where a defendant's commission of the offense of human trafficking of a minor either includes as a part of the crime, or entails as a necessary accompaniment thereto, the use of force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, the result is the aggravated form of the crime.

With this proper reading of the statute in mind, we turn to Baldwin-Green's claims of vagueness and overbreadth.

### 1. *Vagueness*

"To withstand a facial vagueness challenge, a penal statute must satisfy two basic requirements. First, the statute must be definite enough to provide adequate notice of the conduct proscribed. [Citation.] Ordinary people of common intelligence have to be able to understand what is prohibited by the statute and what may be done without violating its provisions. [Citation.] [¶] Second, the statute must provide sufficiently definite guidelines. A vague law impermissibly delegates basic policy matters to the police, judges

and juries for resolution on a subjective basis, with the attendant risk of arbitrary and discriminatory enforcement. [Citation.] [¶] However, only a reasonable degree of certainty is required. The fact that a term is somewhat imprecise does not itself offend due process. Rather, so long as the language sufficiently warns of the proscribed conduct when measured by common understanding and experience, the statute is not unconstitutionally vague. [Citation.]" (*People v. Ellison* (1998) 68 Cal.App.4th 203, 207-208.)

We conclude section 236.1, subdivision (c)(2), satisfies this reasonable certainty test. Indeed, Baldwin-Green does not dispute that an ordinary person of average intelligence would understand what it means to cause, induce, persuade, or attempt to cause, induce, or persuade, a minor to engage in a commercial sex act while possessing the specific intent to violate certain enumerated provisions, including those prohibiting the crimes of pimping and pandering. He does dispute that such a person would understand what it means for the crime to "involve" one of the aggravating conditions. However, as we have explained, this simply means the defendant's commission of the human trafficking crime included as a part of that crime, or necessarily entailed as an accompaniment thereto, the use of force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person. For example, where a defendant attempts to persuade a minor to work for him or her as a prostitute with the intent to pimp or pander that minor, he or she has committed the crime of human trafficking of a minor. Where he or she uses force or fear or another of the aggravating tactics in his or her attempt to persuade, or that attempt at persuasion necessarily entails such force, fear, etc., he or she has committed the aggravated form of the crime. Nor does the statute provide insufficiently definite guidelines so as to impermissibly delegate basic policy matters to the police, judges and juries for resolution on a subjective basis.

Nevertheless, in asserting his facial vagueness challenge, Baldwin-Green relies primarily on *Johnson v. United States* (2015) ___ U.S. ___ [135 S.Ct. 2551, 192 L.Ed.2d 569] (*Johnson*).) There, the United States Supreme Court determined a portion of the Armed Career Criminal Act of 1984 (the Act) was unconstitutionally vague. Under the Act, a defendant convicted of being a felon in possession of a firearm is subject to a more severe punishment if he or she has three or more prior violent felony convictions. The term, "'violent felony'" was defined to include "'burglary, arson, or extortion,'" or any felony that "'involves the use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*.'" (*Id*. at pp. 2555-2556.) In determining whether or not an offense is a violent felony under this provision's residual clause (i.e., the italicized portion above), the court had previously held a categorical approach must be used. Under that approach, "a court assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.' [Citation.]" (*Id*. at p. 2557.) This approach "requires a court to picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that

abstraction presents a serious potential risk of physical injury." (*Ibid*.)

The court held the residual clause was unconstitutionally vague for two reasons.  First, the residual clause "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements," without any guidance as to how one should "go about deciding what kind of conduct the 'ordinary case' of a crime involves." (*Johnson*, *supra*, 135 S.Ct. at p. 2557.)  Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."  (*Id*. at p. 2558.)  The court explained: "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction.  By asking whether the crime '*otherwise* involves conduct that presents a serious potential risk,' moreover, the residual clause forces courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives.  These offenses are 'far from clear in respect to the degree of risk each poses.'  [Citation.]  Does the ordinary burglar invade an occupied home by night or an unoccupied home by day?" (*Ibid*.)  The court concluded: "By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates."  (*Ibid*.)

The only similarity between this case and *Johnson, supra,* ___ U.S. ___ [135 S.Ct. 2551, 192 L.Ed.2d 569] is the residual clause at issue there and section 236.1, subdivision (c)(2), at issue here both include the word "involves."  But it was not the use of that word that rendered the residual clause unconstitutionally vague.  Instead, it was the fact that the residual clause required an assessment of the ordinary case of whatever crime was at issue, *not the actual commission of that crime*, and a comparison of the amount of risk presented by that imagined ordinary case with the amount of risk presented by an imagined ordinary case of burglary, arson, extortion, or other crime involving the use of explosives, in order to determine whether or not the ordinary case of the crime at issue, *again not the actual commission of that crime*, involves conduct that presents a serious potential risk of physical injury to another.  Here, by contrast, the crime of human trafficking of a minor is aggravated where the defendant uses force or fear or another of the aggravating tactics in order to cause, induce, persuade, or attempt to cause, induce, or persuade, a minor to engage in a commercial sex act with the requisite specific intent, or where his or her commission of the offense necessarily entails the use of such force, fear, etc.  Thus, whether or not the crime "involves" one of the aggravating circumstances is determined by the "real-world facts" of the particular defendant's commission of the offense in a particular case.  *Johnson, supra,* ___ U.S. ___ [135 S.Ct. 2551, 192 L.Ed.2d 569] is manifestly inapposite.

. . .

1    ECF No. 77-22 at 19-25.  Petitioner petitioned the California Supreme Court to review this issue,

2    which it declined to do.  ECF No. 77-27.

3        A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair

4    notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously

5    discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  The question

6    under the fair notice theory is "whether a reasonable person would know what is prohibited by the

7    law."  *Tingley v. Ferguson*, 47 F.4th 1055, 1091 (9th Cir. 2022).  The words in a law cannot

8    require "wholly subjective judgments without statutory definitions, narrowing context, or settled

9    legal meanings."  *Id.* (internal quotation marks and citation omitted).  To satisfy due process

10   principles, a law "just needs to be clear in the vast majority of its intended applications."  *Id.*

11   (internal quotation marks and citation omitted).  The standardless enforcement theory asks

12   whether the law "necessarily entrusts lawmaking to the moment-to-moment judgment" of

13   policemen, *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (internal quotation marks and

14   citation omitted), or judges, *Johnson*, 576 U.S. at 597.  In analyzing these issues, it is most

15   important that the "legislature establish minimal guidelines to govern law enforcement."

16   *Kolender v. Lawson*, 461 U.S. 351, 357 (1983).

17       In determining whether a statute is unconstitutionally vague, federal courts must look to

18   the plain language of the statute and the state courts' constructions of the challenged statute.  *Id.*

19   at 355.  Federal courts are not bound by a state court's analysis of the constitutionality of the law.

20   *Nunez v. City of San Diego*, 114 F.3d 935, 942 (1997).  Nevertheless, federal courts must accept a

21   narrow construction of the law if the law is "readily susceptible" to such interpretation.  *Id.*  When

22   a term has a well-settled common law meaning, using that term in a statute does not violate due

23   process even when the term may lend itself to differing definitions.  *Panther v. Hames*, 991 F.2d

24   576, 578 (9th Cir. 1993).

25       California Penal Code § 236.1(c)(2) states that a person who is found guilty of human

26   trafficking will be subject to "[f]ifteen years to life and a fine of not more than five hundred

27   thousand dollars ($500,000) when the offense involves force, fear, fraud, deceit, coercion,

28   violence, duress, menace, or threat of unlawful injury to the victim or to another person."  Under

California law, the term "involve" means "to have within or a part of itself," "contain," or "include." *See People v. Rodola*, 78 Cal. Rptr. 2d 735, 736 (Cal. Ct. App. 1998) (determining the meaning of grand theft "involving a firearm," and determining that "involving" as used in the statue could be reasonable construed as "any grand theft where a firearm is part of the crime"). Additionally, according to dictionary definitions, "involve" also means "to engage as a participant," "to take part," "include," and "entail." Merriam-Webster, *Dictionary*, *Involve*, https://www.merriam-webster.com/dictionary/involve (last visited May 15, 2025).

Here, the fact that § 236.1(c)(2) uses the term "involves" does not render it unconstitutionally vague. The term "involves" has a well-settled common law meaning. *See id.*; *see also Rodola*, 78 Cal. Rptr. 2d at 736. As used in the statute, a reasonable person would understand that he or she will be subject to a fifteen-year-to-life sentence and up to a $500,000 fine if their offense includes, contains, or entails—i.e., involves—the use of force, fear, menace, or other actions. *See Tingley*, 47 F.4th at 1091. This common law understanding also establishes minimal guidelines to govern law enforcement such that the law would not be arbitrarily enforced. *See Kolender*, 461 U.S. at 357.

Petitioner's contention that *Johnson* ruled that a statute that uses the term "involves" is unconstitutionally vague is incorrect. As the state appellate court noted, *Johnson* ruled that the residual clause in the Armed Career Criminals Act was unconstitutionally vague because the clause required judges to imagine an "ordinary case" of a crime when applying the law and did not require the judge to look to the real-world facts of the case at hand. *Johnson*, 576 U.S. at 597. This holding did not hinge on the fact that the statute used the term "involved," but that the statute required judges to compare the case before them to "ordinary cases" to determine whether the defendant had engaged in conduct that "presents a serious potential risk." *Id.* at 597-98. Thus, petitioner's reliance on *Johnson* is misplaced, and her claim should be denied.

**C.    Multiple Punishments for the Same Offense**

Finally, petitioner argues that her due process rights were violated when she was convicted for offenses that were inextricably intertwined, took place in the same time frame, and were motivated by the same intent. ECF No. 66 at 14-15. She acknowledges that the appellate

court stayed the sentences imposed on Counts 5, 15, 22, 24, 34, and 37, but that the court failed to stay Count 13. *Id.* at 14. She contends that the failure to stay Count 13's sentence means she received multiple punishments for a single offense, in violation of California Penal Code § 654. *Id.* at 14-15. She argues that her Count 13 conviction for human trafficking of an adult and her Count 38 conviction for kidnapping for extortion both had the same objective, and she should not be punished for both offenses under California law. *Id.* at 15.

The state appellate court also rejected this argument in petitioner's direct appeal:

### SENTENCING ERROR

### XI

### *Section 654 Claims*

Both defendants contend the sentences imposed on several counts should have been stayed pursuant to section 654. We agree with respect to certain counts and disagree with respect to others, as we explain immediately below.

### A.

### *Legal Principles*

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although these distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one of the separate offenses arising from the single act or omission—the offense carrying the highest punishment." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Where "different crimes were completed by a 'single physical act[]' . . . the defendant may not be punished more than once for that act." (*Ibid.*) For example, "the forceful taking of a vehicle on a particular occasion is a single physical act under section 654" despite the fact that this act amounts to both a robbery and a carjacking. (*Id.* at pp. 313-314.)

Where there is more than one physical act, the following rule applies: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 338; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)  "In such a case, the defendant's single intent and objective are treated as a single act.  For example, a defendant who enters a building with the intent to commit theft and then takes something of value cannot be sentenced for both burglary and theft.  Although defendant committed two criminal acts (entering the building and taking the property), the two acts 'were parts of a continuous course of conduct and were motivated by one objective, theft; the burglary, although complete before the theft was committed, was incident to and a means of perpetrating the theft.' [Citation.]"  (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469, disapproved on another point in *People v. Prunty* (2015) 62 Cal.4th 59, 78, fn. 5; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [defendant convicted of kidnapping and rape; separate punishment for kidnapping not permitted because the sole objective of the kidnapping was to facilitate the rape].)

However, if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he [or she] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

Moreover, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)  "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

"'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.  [Citations.]  Its findings will not be reversed on appeal if there is any substantial evidence to support them.  [Citations.]  We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.'"  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.)

With these legal principles in mind, we turn to defendants' arguments regarding specific counts.

. . .

1

**C.**

2

***Counts 15, 24, 25, and 37***

3

Defendants make essentially the same argument with respect to
Counts 15 (involving C.), 24 (involving Ad.), and 37

4

(involving K.). They argue section 654 barred multiple punishment
for human trafficking (Counts 13, 23, and 35, respectively) and

5

either pandering (Count 15, involving C.), pimping a minor (Count
37, involving K.), or pimping and pandering a minor (Counts 24

6

and 25, involving Ad.) because defendants had the same intent and
objective, again, effecting or maintaining a violation of the pimping

7

or pandering statute. The Attorney General again concedes the
point, but points out the trial court already stayed Count 25. We

8

again concur. The sentences imposed on Counts 15, 24, and 37
should have been stayed.

9

. . .

10

11

**F.**

12

***Count 13***

13

Finally, Count 13 is the human trafficking offense committed
against C. that we already concluded was committed with the same

14

intent and objective as the pandering offense in Count 15, requiring
a stay of the latter count. Defendants additionally claim Count 13

15

must also be stayed because their commission of that crime was
with the same intent and objective as their commission of

16

aggravated kidnapping in Count 38. We disagree.

17

Counts 13 and 38 involved the events occurring after C. left
defendants. About a month later, defendants executed a ruse to get

18

C. into a car with a man claiming to want her services. That man
drove her to defendants, who drove her to a motel in Red Bluff.

19

During the drive, Baldwin-Green physically assaulted C. in the
back seat and told her she owed him $1,300 for damage done to his

20

car when her cousin shot at him on the freeway. He said he was
going to take her "to the woods" where he would "cut off all of

21

[her] hair and . . . take all of [her] teeth out." He also threatened to
find a cold mountain and "leave [her] there naked . . . to die."

22

Baldwin-Green held C.'s head down and covered her face with a
bandana while he threatened her, but she could feel a crescent

23

wrench tightening around her fingers as he threatened to cut them
off. C. was "crying and shaking" and told him she wanted to go

24

home. He said she could not leave because she owed him money.
C. understood this to mean she would be required to go back to

25

work for him as a prostitute. When they got to the motel, Baldwin-
Green escorted C. to the room holding her arm with one hand and a

26

hammer with the other. Inside the room, he asked C. whether she
"was going to make his money." C. said no and repeatedly asked to

27

go home. After some yelling and arguing, including Williams
telling C. to "just give him his money," Baldwin-Green said he
would take her home the following morning. The next morning,

28

Williams tried to convince C. to pay Baldwin-Green back by

working for them as a prostitute. She again refused and asked to go home. Instead of taking her home, defendants cut off her hair, forced her to remove her clothes, and left her on the side of a rural road.

Based on these events, defendants were convicted in Count 13 of human trafficking of an adult, i.e., depriving or violating C.'s liberty with the intent to pimp or pander her, and in Count 38 with kidnapping for extortion, i.e., abducting and carrying her away with the intent to hold and detain her in order to get money or something of value, specifically $1,300 to be made from her services as a prostitute. The trial court impliedly found these offenses were divisible. We conclude this finding is supported by substantial evidence. Defendants violated C.'s liberty with the intent to pander her the moment she was detained in the car against her will. And while, as we have explained, the trafficking offense was a means of committing the pandering offense (Count 15), such that defendants could not be separately punished for the latter offense, the relationship between the trafficking and the kidnapping is not so straightforward. Both involved defendants' desire to have C. work for them as a prostitute, but they kidnapped her to extort a specific amount Baldwin-Green felt personally owed because C.'s cousin had shot his car. The kidnapping also involved physical violence and threats to cut off her fingers, take out her teeth, and leave her naked in the cold to die. This was not simply a situation in which defendants sought to have C. work for them and violated her liberty to ensure she did so. It was personal, as further evidenced by the video Baldwin-Green had Williams take, and his statement in that video, "this is what we do to bitches that . . . didn't care that we was nice."

We conclude that while the intent and objective of both offenses was similar, and overlapped to a great extent, it was sufficiently distinct and independent to justify multiple punishment. . . .

ECF No. 77-22 at 51-60. Petitioner petitioned the California Supreme Court to review this issue, which it declined to do. ECF No. 77-27.

As an initial matter, petitioner's claim, as it currently stands, does not adequately allege a Fourteenth Amendment violation. In her petition, she alleges in a heading that her sentence for Count 13 violates the Fourteenth Amendment, but she makes so such allegations in her actual argument. *See* ECF No. 66 at 14-15. Even more, her actual argument hinges on her contention that her Count 13 sentence violates only state law, and she does not cite to the Fourteenth Amendment or any federal law to support her argument. *See generally id.* As such, she has arguably failed to adequately raise her Fourteenth Amendment claim. *See Jones v. Gomez*, 66

1  F.3d 199, 204-05 (9th Cir. 1995) (holding that conclusory allegations not supported by specific

2  facts are insufficient to warrant habeas relief).  Additionally, to the extent she is arguing that her

3  Count 13 sentence only violates state law, that issue cannot be raised on federal habeas review.

4  *See Watts v. Bonneville*, 879 F.2d 685, 687 (9th Cir. 1989) (declining to review a habeas

5  petitioner's challenge against his sentence under § 654 because such issue was a matter of state,

6  not federal, law).

7      Nevertheless, even if petitioner has adequately raised a Fourteenth Amendment challenge

8  against her sentence for Count 13, her claim should fail.  The Double Jeopardy Clause of the Fifth

9  Amendment is applicable to the states through the Fourteenth Amendment.  *Brown v. Ohio*, 432

10 U.S. 161, 164 (1977).  The Fifth Amendment's Double Jeopardy Clause consists of three separate

11 constitutional rights: (1) protection from a second prosecution for the same offense following an

12 acquittal; (2) protection from a second prosecution for the same offense following a conviction;

13 and (3) protection against multiple punishments for the same offense.  *North Carolina v. Pearce*,

14 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989).

15     However, states are free to punish separate offenses arising out of the same transaction

16 without violating double jeopardy principles.  *Albernaz v. United States*, 450 U.S. 333, 337-42

17 (1981).  In these circumstances, to determine "whether two offenses are sufficiently

18 distinguishable to permit the imposition of cumulative punishment," a court must look to whether

19 each statutory provision requires proof of an additional fact that the other does not.  *Brown*, 432

20 U.S. at 166.  The emphasis in this test is on the elements of the charged offenses.  *Id.*  If each

21 offense requires proof of a fact that the other offense does not, the Fifth Amendment is not

22 violated, regardless of the overlap in the proof offered to establish the crimes.  *Id.*  Importantly,

23 state courts have the final authority to interpret their state's legislation.  *Id.* at 167.

24     In Count 13, petitioner was charged with human trafficking in violation of California

25 Penal Code § 236.1(b), which reads "[a] person who deprives or violates the personal liberty of

26 another with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267,

27 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking."  The elements for

28 this offense are that "(1) the defendant either deprived another person of personal liberty or

1  violated that other person's personal liberty; and (2) when the defendant did so, he or she

2  intended to obtain forced labor or services from that person." *People v. Halim*, 223 Cal. Rptr. 3d

3  491, 501 (Cal. Ct. App. 2017).

4        In Count 38, petitioner was charged with aggravated kidnapping for extortion in violation

5  of California Penal Code § 209(a), which reads "[a] person who seizes, confines, inveigles,

6  entices, decoys, abducts, conceals, kidnaps, or carries away another person by any means

7  whatsoever with intent to hold or detain, or who holds or detains, that person . . . to commit

8  extortion . . . or a person who aids or abets any such act, is guilty of a felony."  The elements of

9  this offense are that (1) the defendant kidnapped, abducted, confined, or carried away a person or

10  held or detained that person, (2) to commit extortion, (3) without the person's consent.

11  CALCRIM 1202.

12        Here, petitioner's sentences for Count 13 and Count 38 do not violate due process,

13  because the elements of these offenses require proof of an additional fact that the other does not.

14  *See Brown*, 432 U.S. at 166.  While both offenses require the defendant to deprive someone of

15  their liberty, human trafficking requires that the defendant do so with the intent to obtain forced

16  labor or services, while kidnapping for extortion requires that the defendant do so with the intent

17  to commit extortion.  These are two separate facts, regardless of the overlap in the proof offered

18  to establish the crimes.  *See id.*  As such, petitioner's claim should be denied.

19        Accordingly, it is hereby RECOMMENDED that:

20        1.  The first amended petition, ECF No. 66, be DENIED;

21        2.  Petitioner's request for oral argument, ECF No. 80, be DENIED.

22        3.  The court decline to issue the certificate of appealability referenced in 28 U.S.C.

23  § 2253; and

24        4.  The Clerk of Court be directed to close this case and to enter judgment accordingly.

25        These findings and recommendations are submitted to the United States District Judge

26  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

27  of service of these findings and recommendations, any party may file written objections with the

28  court and serve a copy on all parties.  Any such document should be captioned "Objections to

Magistrate Judge's Findings and Recommendations," and any response shall be served and filed within fourteen days of service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    May 19, 2025

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE